UNITED STATES *v.* DAVID PERRY CO. (No. 3133) [1]

United States Court of Customs Appeals, January 29, 1929

*Charles D. Lawrence*, Assistant Attorney General (Thomas J. Canty, special attorney, of counsel), for the United States.

No appearance for appellee.

[Oral argument December 13, 1928, by Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND and HATFIELD, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Merchandise invoiced as "dental copper amalgam, cut in squares," imported at the port of St. Paul, Minn., was assessed for duty at 40 per centum ad valorem under the provisions of paragraph 399 of the Tariff Act of 1922, the pertinent portions of which read as follows:

PAR. 399. Articles or wares not specially provided for, * * * if composed wholly or in chief value of iron, steel. lead, copper, brass nickel, pewter, zinc,

---

[1] T. D. 43223.

aluminum, or other metal, but not plated with platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured, 40 per centum ad valorem.

The importer protested the classification and claimed the merchandise free of duty under paragraph 1555 or 1556 which follow:

PAR. 1555. Composition metal of which copper is the component material of chief value, not specially provided for.

PAR. 1556. Copper ore; regulus of, and black or coarse copper, and cement copper; old copper, fit only for remanufacture, copper scale, clippings from new copper and copper in plates, bars, ingots, or pigs, not manufactured or specially provided for.

The United States Customs Court reversed the decision of the collector and held the goods "entitled to free entry under the *eo nomine* provision therefor in said paragraph 1556." The *eo nomine* provision referred to in the paragraph is "cement copper." The decision and the judgment are based upon the testimony of one witness, who did not qualify either as an expert or as a commercial witness, and which is, in part, as follows:

Q. What do you claim this merchandise is?—A. This is a well-known preparation in the dental trade, known as copper amalgam or copper cement. It is an old-established preparation that I should think would be classified, and it appears to me to be classified, under the schedule as duty free.

Q. You mean it is specifically mentioned?—A. Yes, that is my claim, that it is specifically mentioned in the schedule which refers back to 1555 and 1556.

Q. That is under the free list?—A. Yes; that is under the free list.

Q. What is your business?—A. Dental supplies and manufacturer of dental metals.

Q. Are you a chemist?—A. Not a graduate chemist.

Q. Have you ever studied chemistry?—A. In a measure; yes.

Q. You have never taken it up in college?—A. No.

Q. Have you ever made an analysis of this merchandise?—A. Not of this particular merchandise.

Q. What makes you say this particular merchandise is the same as that provided for in that free paragraph?—A. Becomes in every way the same way, because it comes the same as stuff I made myself.

Q. For the purpose of selling in your business?—A. Just experimentally.

Q. To sell?—A. I originally intended to sell it, but I found it could be imported cheaper than I could make it.

Q. This is sold for a definite purpose, isn't it?—A. It is sold for several purposes. In dentistry it has several purposes.

Q. What other purposes?—A. Outside of dentistry, I believe it is sold as cement for glass, for cementing glass tubes together.

Q. You have never sold it for that purpose?—A. No; that is one purpose it is used for, however.

Q. It might be used?—A. Yes; it is suggested in the various technical books for that use.

Q. Have you ever had an analysis made of this merchandise?—A. Not of this particular material. It is a very simple composition, however; very easy to get at the composition of it.

Q. You have never made an analysis of this particular merchandise?—A. Not personally.

In deciding the case the court below said:

> This testimony, however meager, standing uncontradicted as it does, sustains plaintiff's contention that the merchandise is commercially known as copper cement.

The witness was an importer and the owner of the David Perry Co. He was not represented by counsel at the hearings in St. Paul and was not present nor represented at any subsequent hearing or trial. The amount of money involved is represented in the protesting letter to be very small. The cause was transferred from St. Paul to New York for the purpose of obtaining the chemist's report and having an analysis of the material introduced. The Government produced H. A. Gassman, the analyst in charge, for the United States Government, who testified in substance that he had analyzed the material and found it to be in chief value of mercury. It analyzed (in value) 91 per centum mercury, 8 per centum copper, and two-thirds of 1 per centum tin. In quantity there was 31 per centum copper. No brief is filed here for the importer, and the Government's contention that copper cement is not referred to in paragraph 1556 seems to be overlooked in the decision of the court below. In fact, we see no place in the record where the matter was called to the trial court's attention.

The Government urges that appellee has failed to prove that his merchandise is commercially known as copper cement, and that it is not the same material as cement copper. The Government has quoted from numerous texts and authorities which follow:

> The solution of chloride of copper obtained in this way, or that of sulphate of copper recovered from ores that have undergone a sulphating roast (see p. 132), may be made to yield their copper in a powdery but metallic form by placing fragments of scrap iron in the liquid in large tanks, or as it flows through long channels. The iron exchanges places with the copper, because its combining power for sulphuric or hydrochloric acid is greater than that of copper. It gradually dissolves into the solution, and a precipitate of copper separates in the form of *cement copper*, which is rarely sufficiently pure to be used direct, and is therefore subsequently refined in furnaces or electrolytically.—Textbooks of Science. Metals. Huntington and McMillan, page 333.

> 231. WASHING AND REFINING OF CEMENT COPPER.—The cement copper is transferred from the precipitating tanks to washing vats, where it is freed from all chloride liquor. Careful washing is essential, as in the subsequent smelting, any Cl would cause a considerable loss of Cu by volatilization. Analyses of cement copper are given in Table 113.

>     *      *      *      *      *      *      *

> The washed cement copper is partly dried, compressed, and bagged if it is to be shipped. If it is to be treated at the leaching plant, it is charged more or less moist (8-10 per cent $H_2O$) into a reverberatory furnace either by itself or with the addition of pure white metal, and smelted for blister copper; if it is not sufficiently pure for this purpose, it is added to a matte charge.—Metallurgy of Copper. Hofman, page 453

> Cement copper from wet processes should, in most cases, be treated in the blister furnace. It must be thoroughly dampened to prevent mechanical loss,

and when mixed with white metal to the extent of one-fourth or one-third of the entire charge, assists so materially in enriching the product in shortening the operation that it just about repays the cost of its treatment.—Modern Copper Smelting. Peters, page 501.

Funk & Wagnalls New Standard Dictionary contains the following under the definition of the word "cement":

3. *Metal.* (1) A finely divided metal obtained by precipitation. The word in this sense is generally used in combination; as *cement-copper; cement-gold; cement-silver.*

In Wagner's Chemical Technology (Crookes and Fischer), pages 157 and 158, may be found the following:

Cementation consists in precipitating copper from solutions of copper sulphate (blue vitriol, blue stone) by means of metallic iron. Such waters occur in nature in cupriferous districts. The metallic copper obtained by precipitating such solutions with iron is known as cement copper.

*         *         *         *         *         *         *

By means of methodic lixiviation 1.34 per centum of copper—that is, the half of the 2.68 per centum originally present—can be removed in four months; in two years, 2.2 per centum; whilst by the old process of roasting in free heaps and lixiviation with pure water only, 1.1 per centum can be obtained in the same time.

*         *         *         *         *         *         *

An average sample of cement copper obtained by the Witkowitz Mining and Metallurgical Company, from the lixiviation of burnt ore, * * * had, according to L. Schneider (1884), the following composition:—

### Cement Copper

| | Per centum | | Per centum |
|---|---|---|---|
| Copper | 11. 30 | Ferrous chloride | 0. 16 |
| Silver | 0. 521 | Cobaltous chloride | . 29 |
| Gold | Trace. | Nickelous chloride | . 07 |
| Cuprous oxide | 65. 31 | Arsenious chloride | 1. 32 |
| Bismuth oxide | . 19 | Lead sulphate | 2. 19 |
| Iron oxide | 3. 86 | Sodium sulphate | 3. 39 |
| Zinc oxide | . 45 | Calcium sulphate | 5. 32 |
| Arsenious acid | 1. 18 | Magnesium sulphate | . 59 |
| Phosphoric acid | . 20 | Water | 2. 98 |
| Cuprous chloride | . 32 | | |

*       *       *       *       *       *       *

All cement copper, in consequence of the treatment with iron, contains generally considerable admixtures of basic ferric salts * * *.

There is nothing in the record, however, that throws any light on the subject as to whether "cement copper" and "copper cement" are the same or different substances.

The opinion below and the brief of the Government do not refer to Abstract 25274 on *copper cement,* decided in 1911, which construed paragraph 544 of the tariff act of 1909. There the court said:

The lead in the copper precipitate was assessed with duty on the theory that the article imported was a lead-bearing ore. The record establishes beyond question that the copper precipitate, or copper cement, as it is likewise termed, is not an ore. It is obtained by precipitation from the by-products of sulphuric

acid manufacturing plants, and when thus obtained is a finely divided metallic powder. It is far removed from the condition of an ore. It is shown that the article known commercially as copper cement usually has present a small percentage of lead, or at least that the presence of a small per cent of lead in copper cement is not unusual, and while other metals are found precipitated with the copper, the article is produced for the purpose of reclaiming the copper. We find that the imported article is copper cement, and we hold it free of duty, as claimed. The protest is sustained, and the decision of the collector reversed.

Just here it is well to understand that in the Tariff Act of 1909 paragraph 544 was in the exact language of paragraph 1556 of the Tariff Act of 1922, with the exception that in the latter we find "cement. copper" while in the former we find "copper cement." Every Tariff Act treating the subject, except the Tariff Act of 1922, provided for "copper cement" in substantially the same wording and with the same associations as are found in paragraph 1556, *supra*, except that in all tariff acts prior to 1922 the words "copper cement" were used instead of "cement copper." We find the words "copper cement" used in the Tariff Acts of 1913, 1909, 1897, 1894, 1890, and 1883, in the paragraphs which are the predecessors of 1556.

When H. R. 7456 passed the House and went to the Senate, paragraph 1553, which became paragraph 1556, contained the words "copper cement." It was changed in the confidential committee print in the Senate and the amendment, striking out "copper cement" and inserting "cement copper," was accepted on the floor of the Senate. The Congressional Record (vol. 62, pt. 12, 67th Cong., 2d sess., p. 12458) shows: "The following amendments made clerical changes and the House recedes: * * * 1411." Amendment 1411 is the amendment above referred to.

Since the conference committee report adopted by the House states that the change was a clerical one, it seems that we must not give the amended wording of the paragraph any meaning different from what the original paragraph meant in the House of Representatives bill or from what the predecessor paragraphs of prior acts meant where the words were used.

The collector found the importation to be dental copper amalgam. It was so invoiced by the importer in his mail entry and he so styled it in his testimony. Amalgam is defined in Webster's New International Dictionary as follows: "1. An alloy of mercury with another metal or metals."

It will be observed that the court below gave controlling influence to the testimony of the witness who said: "This is a well-known preparation in the dental trade known as copper amalgam or copper cement," and that the court held that this testimony sustained the plaintiff's contention that the merchandise "is commercially known as copper cement." The witness testified that he owned the importing company, the David Perry Co.; that his business was dental

supplies and the manufacture of dental metals; that he was not a graduate chemist, but that, "in a measure," he had studied chemistry but never taken it up in college; that he never made an analysis of this merchandise. We do not think the testimony establishes a commercial meaning of the term. *Lee & Co.* v. *United States*, 15 Ct. Cust. Appls. 202, T. D. 42236.

It was the duty of the court, if possible from the record, to determine what this merchandise was. A nonexpert, noncommercial witness said that it was known as copper amalgam or copper cement. We hardly think the court was justified in regarding this testimony as controlling or as making a prima facie case. If a prima facie case had not been made, the presumption of correctness attaching to the collector's finding that it was not copper cement but was a partly manufactured, nonenumerated article should have stood.

This court can not tell from the record whether copper amalgam used in the dental trade, such as was imported in this case, is or is not copper cement. Before the court below and this court was a sample of the merchandise which may be regarded as proper evidence, but in this case an examination of the sample can hardly be said to be very helpful in an attempt to classify the same. The sample consists of a few lead-colored pieces of heavy, brittle, earthy-appearing substance in the form of squares less than one-fourth inch square and one-sixteenth inch in thickness. The opinion of the court below gave no weight to an examination of the sample. We find ourselves equally unable to derive any help from this source.

There is enough in the record to make us have some doubts as to the proper classification by the collector and. in most cases, under like circumstances, we would be compelled to leave the classification of the merchandise where the collector left it, but we do not believe the trial court was placed in a fair position, since few of the considerations that have been presented to us and ascertained by us were before the trial court. The importer had no lawyer and, in a sense, the incomplete and unsatisfactory record may be charged to him. Under all the circumstances, however, we think Government's counsel should have presented the matter more fully to the court below. At least such facts as the Government presented here could have been presented to the trial court.

We are not overlooking the primary fact that it is not, ordinarily, the duty of the Government to make out a protesting importer's case but, under the peculiar circumstances of this case, in fairness to the trial court, it should have pointed out the real situation in connection with the classification of the merchandise. A court of the rank and dignity of the United States Customs Court, to say nothing of this court, should not be required to give or withhold its approval to the classification of such little-known commodities as

are at bar upon such a presentation. Aside from what are just and proper proceedings for the litigants, the court's position in this kind of case should be kept in mind.

Believing that justice may not have been done in the premises, we think the best interests of all parties involved rest in a new trial of the issue. The statute which authorizes this court to "reverse the same and remand the case with such orders as may seem to it proper in the premises, which shall be executed accordingly," would seem to suggest its application here, and the cause is, therefore, *reversed* and *remanded* with instructions to the United States Customs Court to grant a new trial for the taking of evidence or any further proceedings deemed necessary and not inconsistent with the views herein expressed. *United States* v. *F. B. Vandegrift & Co. et al.*, 16 Ct. Cust. Appls.—, T. D. 43120.